## IN THE UNITED STATES DISTRICT COURT
### NORTHERN DISTRICT OF OHIO
### EASTERN DIVISION

| | |
|---|---|
| TAMARA L. TROYAN, | CASE NO. 1:24-CV-02040-DAP |
| Plaintiff, | JUDGE DAN AARON POLSTER |
| vs. | MAGISTRATE JUDGE DARRELL A. CLAY |
| COMMISSIONER OF SOCIAL SECURITY, | **REPORT AND RECOMMENDATION** |
| Defendant. | |

### INTRODUCTION

Plaintiff Tamara Troyan challenges the Commissioner of Social Security's decision denying supplemental security income (SSI). (ECF #1). The District Court has jurisdiction under 42 U.S.C. §§ 1383(c) and 405(g) and the matter is referred to me to prepare a Report and Recommendation. (Non-document entry of Nov. 21, 2024). Following review, and for the reasons below, I recommend the District Court **REVERSE** the Commissioner's decision and **REMAND** for additional proceedings.

### PROCEDURAL BACKGROUND

Ms. Troyan applied for SSI on January 25, 2022, alleging she became disabled on January 1, 2021. (Tr. 55). After the claim was denied both initially and on reconsideration, Ms. Troyan requested a hearing before an administrative law judge. (Tr. 63, 73, 95). On October 17, 2023, Ms. Troyan (represented by counsel) and a vocational expert (VE) testified before the ALJ. (Tr. 33-54). On November 3, 2023, the ALJ determined Ms. Troyan was not disabled. (Tr. 14-28). On October 4, 2024, the Appeals Council denied Ms. Troyan's request for review, making the hearing decision

the final decision of the Commissioner. (Tr. 1-3; *see* 20 C.F.R. § 416.1481). Ms. Troyan timely

filed this action on November 21, 2024. (ECF #1).

FACTUAL BACKGROUND

## I.      Personal and Vocational Evidence

Ms. Troyan was 52 years old when she filed her application and 54 years old at the hearing.

(*See* Tr. 55). She left school in the eighth or ninth grade. (Tr. 193, 279). She last worked as a

laborer in a factory from January to April of 2002. (Tr. 194).

## II.     Relevant Medical Evidence[1]

### A.      Pre-2021

Ms. Troyan has a long history of mental health treatment. Medical records from 2013 show

she reported family and financial stresses and wanted to see a psychiatrist. (Tr. 266). She received

inpatient psychiatric treatment in her teens and again in July 2016. (*See* Tr. 277-88, 291). Inpatient

records reveal her treating providers felt her emotional or psychological problems were a barrier to

treatment success. (Tr. 279).

Ms. Troyan entered inpatient treatment on July 28, 2016, presenting as downcast, irritable,

inattentive, tense, anxious, and unhappy, with a constricted affect. (Tr. 282). She was hypomanic

but her language skills and associations were intact, she displayed logical thinking and appropriate

thought content, cognitive functioning and fund of knowledge were intact, she appeared to

function in the normal range, and insight and judgment were fair. (*Id.*). Though her concentration

was intact (as assessed by her ability to spell "world" backwards), she was also noted to be fidgety,

---

[1]      Ms. Troyan contends the ALJ erred in relation to the analysis of her psychological
conditions, so I limit my review of the medical evidence accordingly.

easily distracted, and made poor eye contact. (*Id.*). During her brief inpatient stay, Ms. Troyan was observed to be depressed, anxious, irritable, blunted, easily agitated, tense, cooperative, and socially limited. (Tr. 286). During a final mental status examination conducted before Ms. Troyan left against medical advice, she presented as guarded, irritable, attentive, communicative, tense, and anxious with pressured speech and blunt affect. (Tr. 287). Her associations were intact, thinking was logical, thought content appeared appropriate, and cognitive functioning and fund of knowledge were intact. (*Id.*). Her insight and judgment were described as poor. (*Id.*). In addition, although Ms. Troyan was cooperative and attentive during session, the examiner noted overt signs of anxiety including fidgeting and restlessness. (*Id.*).

Available medical records show some treatment with psychiatrist Suresh Patel, M.D., between August 2016 and April 2018. (Tr. 245-53, 291-94). Those records show Ms. Troyan's symptoms responded well to a combination of medications and worsened in their absence. (*Id.*).

In April 2019, during an appointment to establish care with a family physician, Ms. Troyan endorsed mild depression and anxiety and complained of moderate and worsening concentration and attention issues after switching from Vyvanse to Latuda that was not helping her symptoms.[2] (Tr. 296-97). The treating provider noted Ms. Troyan fidgeted in her seat throughout the appointment. (Tr. 297).

---

[2]    Vyvanse is used as part of a treatment program to control symptoms of ADHD, including more difficulty focusing, controlling actions, and remaining still or quiet. *See Lisdexamfetamine, MedlinePlus*, http://medlineplus.gov/druginfo/meds/a607047.html (last accessed Aug. 25, 2025). Latuda is used to treat depression in persons with bipolar disorder. *See Lurasidone*, *MedlinePlus*, http://medlineplus.gov/druginfo/meds/a611016.html (last accessed Aug. 25, 2025).

When Ms. Troyan returned in May for a follow-up appointment, she described her concentration and attention symptoms as "mild and improving," and requested an increased dose of Vyvanse. (Tr. 303-04). The treating provider did not note any fidgeting. (*See* Tr. 304).

When Ms. Troyan returned nearly six months later, she complained of worsening symptoms and severe anxiety about leaving the house because she did not refill her prescription and was out of Vyvanse for several months. (Tr. 308). She also described mild and stable symptoms of depression and anxiety that are exacerbated by stress. (Tr. 309). The treating provider noted Ms. Troyan was talkative, moved constantly, and squirmed in her seat during the appointment. (*Id.*).

In December 2019, Ms. Troyan was still without medication for her concentration and attention symptoms. (Tr. 314). The treating provider again described her as "fidgety" and prescribed Strattera 40 mg for her symptoms.[3] (Tr. 315).

The next month, Ms. Troyan reported that Strattera helped improve her focus and she could more easily stay on task. (Tr. 321). On physical examination, she was "fidgety" and "anxious in [her] seat," but much improved from her last visit. (Tr. 322).

In November 2020, Ms. Troyan's treating provider contacted her because she had not seen the doctor in some time. (Tr. 330). Ms. Troyan indicated her husband prevented her from leaving the home to attend counseling and psychiatric appointments and, for some time, controlled what medications she took. (*Id.*). She was not allowed to refill Prozac and described poorly controlled

---

[3]    In persons with attention deficit hyperactivity disorder (ADHD), Strattera is used as part of a total treatment program to increase the ability to pay attention and decrease impulsiveness and hyperactivity. *See Atomexetine, MedlinePlus*, http://medlineplus.gov/druginfo/meds/a603013.html (last accessed Aug. 25, 2025).

symptoms of anxiety and depression. (*Id.*). She stated she was divorcing him. (*Id.*). The provider refilled her prescription. (Tr. 332).

B.      2021

On August 20, 2021, Ms. Troyan attended a telehealth diagnostic mental health assessment with a licensed social worker at Coleman Professional Services. (Tr. 345-59). There, she explained her childhood history of abuse and described living with various family members as a child because her mother did not like her and was abusive. (Tr. 345, 349). She described a strained relationship with her mother, poor relationships with her sisters, and a good relationship with her brother. (Tr. 345-46). As an adult, she was convicted of misdemeanor domestic violence after getting into a fight with a sister. (Tr. 349). During the interview, Ms. Troyan was cooperative, spoke clearly, and could express herself. (Tr. 352, 354). She endorsed depression and explained "I will cry, then get mad, check myself, and stay away from the dark place" and she becomes "violent and very mean." (Tr. 350). She has "high anxiety" characterized by feelings of nervousness and panic, biting her nails, and sweating. (*Id.*). She endorsed anger and aggression, explaining she will scream and break things. (*Id.*). She sleeps about four hours a night and experiences mood swings that range between anger, depression, and anxiety. (Tr. 351). The evaluator diagnosed bipolar I disorder with anxious distress, with the current episode described as severe. (Tr. 356).

On September 23, Ms. Troyan met with certified nurse practitioner Mary Hall for an initial psychiatric visit at Coleman Professional Services. (Tr. 384). She described a long history of anxiety, depression, and bipolar disorder, all characterized by feelings of sadness and worthlessness, excessive worrying and fearfulness, and mood swings with a manic presentation including impulsiveness and poor decision making, especially in her relationships. (*Id.*). She

5

endorsed taking Prozac for 30 years but not regularly. (*Id.*). NP Hall noted Ms. Troyan was dressed and groomed but "was sweating profusely at times, restless, hyperactive, [had] difficulty sitting still," and cried at times. (Tr. 386). She was labile and became "somewhat demanding" when discussing controlled substances, first asking for stimulants, then Xanax, and finally gabapentin. (*Id.*). NP Hall noted a logical thought process, normal associations, and unremarkable thought content, and described Ms. Troyan as severely anxious, hyper-focused, forgetful, and hypomanic and rose suddenly during the appointment saying she had to leave. (*Id.*). NP Hall determined Ms. Troyan met the criteria for bipolar disorder described as severe, generalized anxiety disorder, and borderline personality disorder and prescribed Prozac 40 mg a day for anxiety and depression and Trileptal 300 mg twice a day for mood stabilization.[4] (Tr. 389).

On October 7, Ms. Troyan followed up with NP Hall by telephone, describing her anxiety as "out of this world" and herself as irritable, frustrated, and easily aggravated. (Tr. 376). She felt her mood swings were worsening, had constant racing thoughts, and slept poorly due to bad nightmares. (*Id.*). A mental status examination revealed similar findings to the prior appointment. (Tr. 378-79). NP Hall described the bipolar episode as severe and continued Ms. Troyan's prescriptions. (Tr. 380).

---

[4]        Prozac is prescribed to treat depression. *See Fluoxetine*, *MedlinePlus*, http://medlineplus.gov/druginfo/meds/a689006.html (last accessed Aug. 25, 2025). Trileptal is sometimes prescribed to treat bipolar disorder. *See Oxcarbazepine, MedlinePlus,* http://medlineplus.gov/druginfo/meds/a601245.html (last accessed Aug. 25, 2025).
        Borderline personality disorder is a mental condition in which a person has long-term patterns of unstable and turbulent emotions. These inner experiences often result in impulsive actions and chaotic relationships with other people. *See Borderline personality disorder, MedlinePlus*, http://medlineplus.gov/ency/article/000935.htm (last accessed Aug. 25, 2025).

On October 29, Ms. Troyan presented at a follow-up telehealth appointment with NP Hall, stating shed felt calmer when taking Trileptal but she continued to have anxiety and racing thoughts affecting her concentration and sleep. (Tr. 368). NP Hall noted Ms. Troyan was well-groomed, calm, and cooperative. (Tr. 370). A mental status examination revealed some pressured speech, a logical thought process, normal associations, unremarkable thought content, and a dysthymic and anxious mood with a congruent and constricted affect. (Tr. 371). NP Hall again described Ms. Troyan's bipolar disorder episode as severe, continued her prescriptions for Prozac and Trileptal, and prescribed Seroquel 25 mg for mood.[5] (Tr. 373).

On November 19, Ms. Troyan presented at a follow-up telehealth appointment with NP Hall and described "doing okay." (Tr. 360). She was spending more time with her mother, a reportedly difficult task because her mother does not like her. (*Id.*). She stopped taking Seroquel because it made her sleep too much and gave her bad nightmares, but she reported the higher dose of Prozac helped her some. (*Id.*). She struggled to recall whether she always took her medications as prescribed, and NP Hall described her medication compliance as poor. (*Id.*). She endorsed chronic intermittent mood swings, depression present about 50% of the time, mild-to-moderate intermittent racing thoughts affecting her focus and concentration, and chronic intermittent anxiety more than 50% of the time. (*Id.*). NP Hall described Ms. Troyan's mood as depressed and anxious, with a constricted affect and fair-to-poor insight and judgment. (Tr. 363). A mental status examination also indicated forgetfulness. (*Id.*). NP Hall continued to describe Ms. Troyan's bipolar disorder episode as severe. (Tr. 364).

---

[5]        Seroquel is used to treat bipolar disorder. *See Quetiapine, MedlinePlus*, http://medlineplus.gov/druginfo/meds/a698019.html (last accessed Aug. 25, 2025).

C.    2022

On August 29, Ms. Troyan returned to Coleman Professional Services and met with APRN Mackenzie Kriss for medication management. (Tr. 439). She arrived 30 minutes late and appeared anxious. (*Id.*). She had not taken her medications in months, described her anxiety as "super bad," endorsed panic attacks "here and there," and denied having issues with irritability or anger. (*Id.*). She related ongoing stressors, including her son's legal troubles. (*Id.*). A mental status examination revealed a logical thought process, normal associations, and unremarkable thought content but also moderate depression, high anxiety, forgetfulness, and a limited fund of knowledge. (Tr. 441-42). RN Kriss agreed with the bipolar diagnosis, described as severe. (Tr. 443). She prescribed Prozac 20 mg for depression and anxiety and hydroxyzine 25 mg twice a day as needed for anxiety.[6] (Tr. 444).

Ms. Troyan met with RN Kriss again on September 19 and described feeling "really depressed." (Tr. 432). She endorsed taking Prozac as prescribed with little benefit and described sometimes having severe anxiety with itching. (*Id.*). She also described constant nightmares and sought medication. (*Id.*). In the mental status examination, RN Kriss noted racing thoughts, forgetfulness, and fair-to-poor insight and judgment, but otherwise normal findings. (Tr. 434-35). Ms. Troyan forgot about her prescription for hydroxyzine but said she will try it. (Tr. 437). RN Kriss noted Ms. Troyan's treatment progress was complicated by medication-noncompliance issues

---

[6]    Hydroxyzine is sometimes prescribed to relieve anxiety and tension. *See Hydroxyzine, MedlinePlus*, http://medlineplus.gov/druginfo/meds/a682866.html (last accessed Aug. 25, 2025).

and borderline personality disorder, described her bipolar disorder as severe, continued her medications, and prescribed Prazosin for nightmares.[7] (Tr. 436-37).

On October 10, Ms. Troyan attended a telehealth appointment with RN Kriss where she appeared "calm and smiling." (Tr. 424). She reported feeling "kind of depressed" and anxious, with improved irritability. (*Id.*). Ms. Troyan did not like hydroxyzine because it made her feel jittery. (*Id.*). She had yet to try Prazosin because she was not having as many nightmares. (*Id.*). A mental status examination revealed similar findings to the prior appointment. (Tr. 426-27). RN Kriss continued Prozac and Prazosin and discontinued hydroxyzine. (Tr. 429). She again described Ms. Troyan's bipolar disorder as severe and noted her compliance with medication was "better," but she "still forgets" to take them two or three times a week. (*Id.*).

D.    2023

On May 15, Ms. Troyan attended a telehealth appointment with RN Kriss. (Tr. 493). She was irritable and profane, reported medication compliance, but she still felt stressed and described problems getting things done because she cannot concentrate. (*Id.*). She requested medication to help with concentration and her ADHD symptoms. (*Id.*). She was minimally receptive when RN Kriss expressed disagreement with the ADHD diagnosis. (*Id.*). RN Kriss explained that stress can significantly affect concentration and emphasized the importance of stress management. (*Id.*). Ms. Troyan endorsed worsened depression, anxiety, irritability, and sleep. (*Id.*). She also described feeling angry and forgetful. (Tr. 495-96). RN Kriss increased Prozac to 40 mg, continued Prazosin,

---

[7]    Prazosin is sometimes prescribed to treat sleep problems associated with posttraumatic stress disorder (PTSD). *See Prazosin*, *MedlinePlus*, http://medlineplus.gov/druginfo/meds/a682245.html (last accessed Aug. 25, 2025).

and prescribed Buspar for anxiety.[8] (Tr. 498). RN Kriss again described Ms. Troyan's bipolar disorder as severe and noted her treatment progress was complicated by medication-noncompliance issues and her borderline personality disorder, emphasizing that she "struggles to remember her daily [P]rozac." (Tr. 497-98).

On June 12, Ms. Troyan attended a follow-up telehealth appointment with RN Kriss and endorsed "feeling stressed but I'm alright." (Tr. 485). She felt overwhelmed about catching up on paperwork, described moderate depression and anxiety, and stated the increased dose of Prozac was helping her mood. (Tr 485, 490). RN Kriss again described Ms. Troyan's bipolar disorder as severe, noted her treatment progress was complicated by medication-noncompliance issues and borderline personality disorder, and continued her medications. (Tr. 489-90).

On July 20, Ms. Troyan joined a telehealth appointment for a diagnostic assessment. (Tr. 463). There, she reported depression characterized by low motivation, low energy, and irritability; anxiety characterized by nail-biting, sweating, and a reluctance to leave the home; mood swings; poor concentration; and racing thoughts. (Tr. 463-64). The interviewer described Ms. Troyan as very talkative and difficult to redirect at times, noting she demonstrated issues with attention during the interview. (Tr. 463-64). Ms. Troyan stated she was selling her home and her mother and daughter help her financially. (Tr. 463). A mental status examination revealed Ms. Troyan was cooperative but spoke in a rapid and pressured manner. (Tr. 467). Her thought process was described as circumstantial, tangential, racing, and requiring redirection "many times" throughout the assessment. (Id.). She had fair insight and judgment. (Tr. 468). The examiner diagnosed bipolar

---

[8]     Buspar is prescribed to treat anxiety disorders. *See Buspirone, MedlinePlus*, http://medlineplus.gov/druginfo/meds/a688005.html (last accessed Aug. 25, 2025).

disorder, severe; generalized anxiety disorder characterized by a racing heart, irritability, and reluctance to leave the home; and borderline personality disorder with a history of intense relationships and an instability in self-concept. (Tr. 474).

On July 24, Ms. Troyan presented at a follow-up telehealth appointment with RN Kriss and described doing "pretty good." (Tr. 477). She reported medication compliance and felt her anxiety was more manageable. (*Id.*). Although Prazosin generally helped, she continued to have occasional nightmares. (*Id.*). A mental status examination revealed moderate depression and anxiety, mild irritability, and fair-to-poor insight. (Tr. 479-80). RN Kriss characterized Ms. Troyan's bipolar disorder as severe and continued her medications as prescribed. (Tr. 482).

## III. Opinion Evidence

On May 23, 2022, Ms. Troyan underwent a consultative examination with Jennifer Haaga, Psy.D. (Tr. 398-405). There, Ms. Troyan explained she is divorced and lives alone. (Tr. 399). She endorsed a history of physical, emotional, and sexual abuse, and a family history of mental health issues. (*Id.*). She described maintaining an "on-and-off" relationship with her mother, "okay" relationships with siblings, and "good" relationships with her three children. (Tr. 398-99). She socializes with her daughter and grandchildren but stays home when she feels "too nervous." (Tr. 399). She does not attend church or engage in clubs or organizations. (*Id.*). Ms. Troyan dropped out of high school after struggling with learning difficulties, disciplinary issues (detentions, suspensions, and expulsions), and poor relationships with teachers and peers. (*Id.*).

Ms. Troyan described a sparse work history. She worked briefly for in a factory "a very long time ago" and used to help her father "from time to time" with landscaping and cleaning cars. (*Id.*). During her brief work history, Ms. Troyan has never been fired and has no history of

interpersonal problems with supervisors or coworkers, stating she "would get upset and just leave" to avoid conflicts with others. (*Id.*).

Ms. Troyan reported diagnoses for bipolar disorder, depression, anxiety, manic depression, and ADHD. (Tr. 400). She ties her mental health struggles to the abuse she endured when younger. (*Id.*). "A long, long time ago," Ms. Troyan was twice admitted for psychiatric inpatient treatment. (*Id.*). She has taken a variety of medications in the past and endorsed some relief with medication for ADHD and anxiety. (*Id.*).

Ms. Troyan "never really had a schedule." (*Id.*). On a day-to-day basis, she struggles with sleep disruptions, sometimes wanting to sleep a lot but mostly not sleeping. (*Id.*). She spends her time doing arts and crafts, making a mess in the process and struggling to maintain focus. (*Id.*). She may or may not complete household chores, does not have a bank account, and relies on her daughter to help manage her finances because she does not do well with numbers. (*Id.*).

Dr. Haaga noted Ms. Troyan was appropriately dressed and adequately groomed, was cooperative and volunteered information, maintained fleeting eye contact, and demonstrated adequate motivation during the interview. (*Id.*). Though Ms. Troyan said less than what is normal, she was understandable and articulate, and her thought processes were logical, organized, coherent, and goal directed. (Tr. 401). Ms. Troyan appeared distressed and anxious, her mood was "frustrated, depressed, anxious, confused a lot, and mad a lot," and she experiences major mood swings from one moment to the next. (*Id.*). She endorsed symptoms of anxiety, including chest pains, feeling as though she cannot breathe, and being unable to leave the house. (*Id.*). Her past abuse affects her daily life, and she struggles to set aside those nervous thoughts and fears. (*Id.*). Dr. Haaga noted some motor manifestations of anxiety, including shaking her legs and wrapping her

arms around herself, and some obsessive-compulsive tendencies and behaviors: "She said, 'I check things a lot and I can't stay focused to know if I did something right and I have to go back.'" (Tr. 401-02).

After sensorium- and cognitive-function testing, during which Ms. Troyan successfully answered some questions but struggled some with recall tasks and math beyond basic addition and subtraction, Dr. Haaga opined Ms. Troyan operated in the low-average range of cognitive functioning, noting she "needed reminders of what she was asked." (Tr. 402). She described Ms. Troyan's common-sense reasoning, judgment, and insight as "fair." (*Id.*). Ms. Troyan displayed adequate attention, concentration, and the ability to abstract; denied memory problems in general; and endorsed feeling confused when overwhelmed. (*Id.*).

Dr. Haaga diagnosed Ms. Troyan with bipolar disorder, anxiety disorder with symptoms of panic attacks and agoraphobia, PTSD, and an unspecified substance-related disorder. (Tr. 403). Dr. Haaga also provided the following functional assessment:

**Describe the claimant's abilities and limitations in understanding, remembering, and carrying out instructions.**

She described no difficulties with memory and demonstrated no difficulties with memory during the current evaluation. She is capable of comprehending and completing simple routine tasks as well as some more complex, familiar tasks. She reported problems with learning while in school and stated she relies on others for assistance in managing her affairs. She is likely to learn more repetitive tasks as symptoms of anxiety may interfere with remembering and carrying out instructions.

**Describe the claimant's abilities and limitations in maintaining attention and concentration, and in maintaining persistence and pace, to perform simple tasks and to perform multi-step tasks.**

She recalled five digits forward and two digits backward on the digit span task. However, her symptoms of mood disorder, anxiety, and PTSD will likely cause difficulties in this area or will exacerbate those difficulties that she does have. This will make many tasks somewhat more difficult. Specifically, when the demands

become too great, Ms. Troyan will have some difficulty with attention and concentration. She reported she has difficulties leaving her home due to anxiety and this is likely to also affect her focus in typical work situations. She stated her mood will affect her activity level.

**Describe the claimant's abilities and limitations in responding appropriately to supervision and to coworkers in a work setting.**

Ms. Troyan's interaction with this examiner during the current evaluation was adequate, and she described that she has maintained okay relationships with family. She has a history of no significant interpersonal problems with supervisors or coworkers. She reported she is easily irritated and angry. She reported she has left work situations due to conflicts with others.

**Describe the claimant's abilities and limitations to responding appropriately to work pressures in a work setting.**

Ms. Troyan does not take psychiatric prescription medication to help manage symptoms but continues to experience difficulties. She has okay relationships with family. These relationships are not likely to create a positive social support system which would positively influence her ability to withstand stress and pressures of work activities. She likely has a history of substance use which she may have used in part to manage pressures. She seemed anxious in the interview and seems to have few adaptive coping skills.

(Tr. 404).

On June 10, 2022, state agency reviewing psychologist Irma Johnston, Psy.D., reviewed Ms. Troyan's medical records for initial consideration of her claim. In the four categories of mental functioning, she opined Ms. Troyan had a mild limitation in "interacting with others" and moderate limitations in "understanding, remembering, and applying information," "concentrating, persisting, and maintaining pace," and "adapting or managing herself." (Tr. 59). Dr. Johnston determined Ms. Troyan can understand and remember very short and simple instructions, carry out simple repetitive tasks in an independent, low stress setting without a fast pace, and work in settings where very little change in the structure or setting of the workplace occurs. (Tr. 60-61). Dr. Johnston also evaluated Dr. Haaga's medical opinion and concluded it "supports the evidence on

14

file of anxiety and PTSD that causes attention and concentration issues. The medical opinion is fully consistent." (Tr. 60).

On February 21, 2023, on reconsideration, state agency reviewing psychologist Kristen Haskins, Psy.D., reviewed Ms. Troyan's updated medical records and opined she had moderate limitations in all four categories of mental functioning. (Tr. 67). Dr. Haskins agreed Ms. Troyan can understand and remember short and simple instructions and added a limitation to perform one-to-three step tasks. (Tr. 69). She also determined Ms. Troyan can carry out simple repetitive short-cycle tasks in a setting lacking a fast-paced demand and where she can work away from the distractions of others, interact on a superficial basis in the work setting, and "adjust to minor changes in the work setting and still complete an ordinary routine consistent on an independent basis" and that "major changes will need to be introduced in advance and then gradually phased in to allow the claimant time to adjust to new expectations." (Tr. 70). In all, Dr. Haskins found Dr. Johnston's opinion consistent with the record medical evidence but adjusted the narrative and added increased restrictions on Ms. Troyan's ability to interact with others "because of the dynamics related to the personality disorder." (Tr. 71).

## IV.    Testimonial Evidence

One month after Ms. Troyan applied for SSI, a Field Office representative interviewed her by telephone. (Tr. 181-83). It is unclear what questions the interviewer asked, how Ms. Troyan responded, or whether the interviewer asked Ms. Troyan to read anything out loud, but the interviewer did not note any difficulties with hearing, reading, breathing, understanding, coherency, concentrating, talking, or answering. (Tr. 182).

At the administrative hearing, Ms. Troyan testified she left high school after the ninth grade and has not obtained her GED. (Tr. 39-40). She has been married and divorced four times. (*See* Tr. 45; *see also* Tr. 361). She does not work but helps clean her mother's floors weekly and watches her five grandchildren sometimes, but not too often because "it gets pretty stressful." (Tr. 41; *see also* Tr. 45 (limiting babysitting to once a month)). Ms. Troyan does her own shopping but avoids large stores like Wal-Mart, preferring to shop during off-hours to avoid the crowds and noise. (Tr. 45).

Ms. Troyan has not worked due to her anxiety. (Tr. 42). She described it as more than "just stressful," stating she feels people are judging her and looking at her, and she has difficulty leaving the house. (*Id.*). On some days, she struggles to decide what to wear or even get out of bed. (*Id.*). When she feels the day is "total chaos," she leaves whatever situation she is in, no matter the circumstance. (*Id.*). If she is driving and becomes frustrated or anxious, she pulls over and collects herself before moving on or returning home. (Tr. 44). Ms. Troyan struggles with reading, spelling, and completing paperwork. (Tr. 42). Numbers are "all scrambled" and "mumbo-jumbo" in her head. (*Id.*).

Ms. Troyan takes Buspar and Prozac for mental health symptoms and a medication to help her sleep and reduce nightmares. (Tr. 40-41). She described little relief with Buspar and no relief with Prozac. (Tr. 43). Although her nightmares are not as bad anymore, she sleeps "violently" and sometimes awakens with self-inflicted bruises. (*Id.*).

The VE testified a person of Ms. Troyan's age and education who can perform medium-exertion work but with the functional limitations described in the ALJ's residual functional capacity (RFC) determination could work as a laundry worker, linen-room attendant, and janitor.

(Tr. 50). The VE stated employers do not tolerate off-task time beyond 10% of the workday and no more than one absence per month. (Tr. 51-52).

### Standard for Disability

Eligibility for benefits depends on the existence of a disability. 42 U.S.C. § 423(a). "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. § 416.905(a); *see also* 42 U.S.C. § 1382c(a)(3)(A).

The Commissioner follows a five-step evaluation process—found at 20 C.F.R. § 416.920—to determine whether a claimant is disabled:

1. Was the claimant engaged in a substantial gainful activity?

2. Did the claimant have a medically determinable impairment, or a combination of impairments, that is "severe," which is defined as one which substantially limits an individual's ability to perform basic work activities?

3. Does the severe impairment meet one of the listed impairments?

4. What is the claimant's residual functional capacity and can claimant perform past relevant work?

5. Can the claimant do any other work considering her residual functional capacity, age, education, and work experience?

Under this five-step analysis, the claimant has the burden of proof in steps one through four. *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997). The burden shifts to the Commissioner at step five to establish whether the claimant has the residual functional capacity (RFC) to perform available work in the national economy. *Id.* The ALJ considers the claimant's RFC, age, education, and past work experience to determine whether the claimant could perform other work. *Id.* Only if a claimant satisfies each element of the analysis, including inability to do

other work, and meets the duration requirements, is she determined to be disabled. 20 C.F.R. § 416.920(b)-(f); *see also Walters*, 127 F.3d at 529.

### THE ALJ'S DECISION

At Step One, the ALJ determined Ms. Troyan had not engaged in substantial gainful activity since January 25, 2022, the application date. (Tr. 19). At Step Two, the ALJ identified the following severe impairments: osteoarthritis/mild degenerative disc disease of the cervical and lumbar spine, depression, generalized anxiety disorder, PTSD, and ADHD. (*Id.*). At Step Three, the ALJ found Ms. Troyan's impairments did not meet the requirements of, or were not medically equivalent to, a listed impairment. (Tr. 22-24).

At Step Four, the ALJ determined Ms. Troyan's RFC as follows:

> After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform medium work as defined in 20 CFR 416.967(c) except that the claimant may frequently balance, stoop, kneel, crouch, crawl, climb ramps and stairs and may occasionally climb ladders, ropes, or scaffolds; the claimant is limited to the performance of simple, routine tasks and to the making of no more than simple, work-related decisions, conducted in a work setting free of assembly line work or work involving strict production quotas, which setting requires no more than occasional and superficial [defined as precluding arbitration, negotiation, confrontation, directing the work of, or bearing responsibility for the safety or welfare of, others] interactions with others, which setting contemplates no more than occasional work place changes, explained in advance of gradual implementation.

(Tr. 22). The ALJ determined Ms. Troyan does not have any past relevant work. (Tr. 27). At Step Five, the ALJ determined jobs exist in significant numbers in the national economy that Ms. Troyan can perform, including laundry worker, linen-room attendant, and janitor. (Tr. 28). Therefore, the ALJ found Ms. Troyan was not disabled. (*Id.*).

STANDARD OF REVIEW

In reviewing the denial of Social Security benefits, the court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record." *Walters,* 127 F.3d at 528. The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)). "Substantial evidence" is a "term of art" used to describe how courts review agency factfinding. *Biestek v. Berryhill,* 587 U.S. 97, 102 (2019) (citation omitted). Under that standard, a court looks to an existing administrative record and asks whether it contains sufficient evidence to support the agency's factual determinations. *Id.*, 587 U.S. at 102-03 (citation omitted). Substantial evidence is "more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Hum. Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992). But "a substantiality of evidence evaluation does not permit a selective reading of the record. Substantiality of evidence must be based upon the record taken as a whole. Substantial evidence is not simply some evidence, or even a great deal of evidence. Rather, the substantiality of evidence must take into account whatever in the record fairly detracts from its weight." *Brooks v. Comm'r of Soc. Sec.*, 531 F.App'x 636, 641 (6th Cir. 2013) (cleaned up).

In determining whether substantial evidence supports the Commissioner's findings, the court does not review the evidence de novo, make credibility determinations, or weigh the evidence. *Brainard v. Sec'y of Health & Hum. Servs.*, 889 F.2d 679, 681 (6th Cir. 1989). Even if substantial evidence (or indeed a preponderance of the evidence) supports a claimant's position,

the court cannot overturn "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003). This is because there is a "zone of choice" within which the Commissioner can act without fear of court interference. *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986).

Along with considering whether substantial evidence supports the Commissioner's decision, the court must determine whether proper legal standards were applied. The failure to apply correct legal standards is grounds for reversal. Even if substantial evidence supports the ALJ's decision, the court must overturn when an agency does not observe its own regulations and thereby prejudices or deprives the claimant of substantial rights. *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 546-47 (6th Cir. 2004).

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F.Supp.2d 875, 877 (N.D. Ohio 2011) (internal quotations omitted); *accord Shrader v. Astrue*, No. 11-13000, 2012 WL 5383120, at *6 (E.D. Mich. Nov. 1, 2012) ("If relevant evidence is not mentioned, the Court cannot determine if it was discounted or merely overlooked.").

## DISCUSSION

Ms. Troyan challenges the ALJ's evaluation of the medical opinions. She first contends the ALJ did not explain how he considered the supportability and consistency of Dr. Haaga's opinions and the ALJ had a duty to recontact the doctor for clarification or correction once he determined the opinions were "vague." (ECF #11 at PageID 553-54). In addition, she argues the RFC did not account for the limitations identified in Dr. Haaga's report. (*Id.* at PageID 552). Second, she states

20

the ALJ improperly "ignored" the state agency psychological consultant's opinion that she is limited to performing one-to-three-step tasks and argues the ALJ substituted a medical judgment for his own interpretation by choosing to ignore that opinion. (*Id.* at PageID 556-58).

The Commissioner responds the ALJ evaluated the medical opinions properly and substantial evidence supports his rationale. (ECF #13 at PageID 568-72). Regarding Dr. Haaga's report, the Commissioner responds the ALJ may decline to adopt vague or equivocal limitations. (*Id.* at PageID 573). Regarding the state agency psychological consultant's opinion, the Commissioner argues the ALJ properly explained why he ignored the restriction to one-to-three-step tasks. (*Id.* at PageID 576).

**I.      The ALJ's assessment of Dr. Haaga's medical opinion does not warrant remand.**

As part of the RFC assessment, the ALJ must analyze all medical opinions of record for their persuasiveness. 20 C.F.R. § 416.920c(c). The ALJ determines a medical opinion's persuasiveness based on multiple factors, including the opinion's supportability and consistency, the medical source's relationship with the claimant, the medical source's specialization, and other factors, such as the medical source's familiarity with other evidence relevant to the claim. *Id.* Supportability and consistency are the two most important factors and so the ALJ is required to explain how he considered them. *Id.* § 416.920c(b)(2); *Jacob B. v. Comm'r of Soc. Sec.*, No. 1:20-cv-617, 2022 WL 130761, at *8 (S.D. Ohio Jan. 14, 2022) ("In the absence of a sufficient explanation of supportability and consistency with the record as a whole, the Court cannot conclude that the ALJ's consideration of [a medical source's] opinion is supported by substantial evidence."). To that end, the ALJ must discuss the extent to which a medical source's opinion is supported by relevant medical evidence and the source's supporting explanation and the extent to which the opinion is

consistent with the evidence from other medical and nonmedical sources in the record. *See Revisions to Rules Regarding the Evaluation of Medical Evidence*, 82 FR 5844-01, 2017 WL 168819, at *5853 (Jan. 18, 2017); *see also* 20 C.F.R. §§ 416.920c(c)(1) ("The more relevant the objective medical evidence and supporting explanations presented by a medical source are to support the medical opinion, the more persuasive it will be."), 416.920c(c)(2) ("The more consistent a medical opinion . . . is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion . . . will be.").

An ALJ need not incorporate every limitation from a medical source's opinion, even if the ALJ finds that source persuasive. *Reeves v. Comm'r of Soc. Sec.*, 618 F.App'x 267, 275 (6th Cir. 2015). But if the RFC conflicts with an opinion from a medical source, the ALJ must explain why the opinion was not adopted. *Kinney v. Comm'r of Soc. Sec.*, No. 23-3889, 2024 WL 2273365 (6th Cir. 2024) (citing Social Security Ruling (SSR) 96-8p, 1996 WL 374184, at *7 (July 2, 1996)).

### A.     The ALJ reasonably discounted the opinion as vague and was not required to contact Dr. Haaga for additional or clarifying information.

In her opinion, Dr. Haaga provided two functional restrictions. In the first area of mental functioning ("understanding, remembering, and carrying out instructions"), Dr. Haaga concluded Ms. Troyan can comprehend and complete simple, routine tasks and some complex tasks with which she is familiar. (Tr. 404). Dr. Haaga also noted that symptoms of anxiety may interfere with remembering and carrying out instructions and, as a result, Ms. Troyan is likely to learn more tasks that are repetitive, but did not restrict her to performing repetitive tasks. (*Id.*). In the second area of mental functioning ("maintaining attention and concentration" and "maintaining persistence and pace" to perform simple and multi-step tasks), Dr. Haaga determined Ms. Troyan's symptoms

22

would cause an unspecified degree of difficulty with attention and concentration when the demands of work become too great. (*Id.*).

In the third and fourth areas of mental functioning ("responding appropriately to supervision and coworkers" and "responding appropriately to work pressures in a work setting"), Dr. Haaga did not offer any opinions. She identified evidence that might support restrictions in those areas of functioning but did not offer any impairment-related restrictions or describe what Ms. Troyan can still do. (*Id.*).

> The ALJ found Dr. Haaga's opinion not persuasive:
>
> The consultative psychological examiner, Jennifer Haaga, Psy.D., indicated that the claimant would have some limitations understanding, remembering, and carrying out instructions; some limitations in concentrating, persisting, and maintaining pace; some limitations interacting with others; and some limitations adapting to the stressors of day-to-day work. Dr. Haaga examined the claimant on a single occasion and was reporting within the bounds of her professional certifications and specialty. As this opinion indicates limitations in each of the four psychologically based, work-related areas of function, it is at least marginally consistent with, and supported by, the overall evidence of record discussed in digest form in the preceding paragraph/in the analysis. However, her opinion overstates the claimant's limitations with regard to understanding, remembering, and carrying out instructions, and, as to the specific degree of work-related limitations that would appertain, this opinion is vague and therefore less than helpful.

(Tr. 27) (cleaned up).

The ALJ's rejection of Dr. Haaga's opinion that Ms. Troyan will have "some difficulty" in maintaining attention and concentration when the demands of work "become too great" is proper because an ALJ may discount opinions expressed in vague terms. *See Quisenberry v. Comm'r of Soc. Sec.*, 757 F.App'x 422, 434 (6th Cir. 2018) (holding an ALJ may properly discount an opinion that does not offer any specific functional limitations and expresses functional limitations in vague

terms); *see also Gaskin v. Comm'r of Soc. Sec.,* 280 F.App'x 472, 476 (6th Cir. 2008) (finding the ALJ properly rejected a portion of an opinion as vague).

Second, Ms. Troyan asserts the ALJ's finding that the opinion was unacceptably vague "invoked [his] duty to correct an inadequate consultative examination report." (ECF #11 at PageID 554). The applicable regulations require the agency to recontact a consultative examiner for clarification when the report is "inadequate or incomplete." 20 C.F.R. § 416.919p(b). Implicit in Ms. Troyan's argument is that a consultative examination report is inadequate or incomplete when the examiner expresses opinions in vague terms. An opinion about what claimants can still do despite their impairments is an element of a complete consultative examination and should be included in the examiner's report, but the absence of a medical opinion does not necessarily render a report incomplete. 20 C.F.R. § 416.919n(c)(6); *see Dooley v. Comm'r of Soc. Sec.,* 656 F.App'x 113, 122 (6th Cir. 2016) (finding an ALJ is not required to contact a consultative examiner when the ALJ found the opinion to be vague and unsupported by the evidence). The ALJ reasonably concluded Dr. Haaga's opinion was vague because she did not specify the degree of impairment. That finding does not render the examination report "incomplete" or "inadequate" and, consequently, the ALJ was not required to recontact the consultative examiner for a revised report or additional information.

**B.     Though the ALJ erred in analyzing the consistency and supportability of Dr. Haaga's opinion, the error is harmless because the ALJ adopted the limitation at issue in the RFC.**

The ALJ determined Dr. Haaga overstated Ms. Troyan's limitations in understanding, remembering, and carrying out instructions. (Tr. 27). Little can be extrapolated from this conclusion. The ALJ did not indicate what medical findings Dr. Haaga made or whether those

findings were relevant to and supportive of her opinion (*i.e.*, going to the supportability of the opinion) or compare the findings supporting the opinion with the other evidence of record (*i.e.*, going to the consistency of the opinion). Instead, the ALJ refers the reader to "the preceding paragraph" and other unspecified portions of the decision to explain his conclusions.

The Commissioner contends the ALJ's explanation is sufficient. First, the Commissioner asserts the ALJ discussed the supportability factor "via his remarks that Dr. Haaga only examined Plaintiff on one occasion, thus detracting from the supportability of her opinions." (ECF #13 at PageID 570). I find this argument unpersuasive because the frequency of examination is not relevant to the supportability of an opinion, but to the medical source's relationship with the claimant, a separate persuasiveness factor. *See* 20 C.F.R. § 416.920c(c)(3)(i)-(v).

Next, the Commissioner asserts that the ALJ's failure to discuss explicitly consistency and supportability was harmless. (ECF #13 at PageID 571). I find this argument persuasive because even if the ALJ did not sufficiently articulate how he considered the supportability and consistency of the opinion, the ALJ actually adopted Dr. Haaga's opinion concerning Ms. Troyan's capability to understand, remember, and carry out instructions. The Sixth Circuit has not addressed when an ALJ's failure to analyze a medical opinion for supportability and consistency under 20 C.F.R. § 416.920c can be excused as harmless error. *See Brooks v. Comm'r of Soc. Sec.,* No. 2:22-cv-158, 2024 WL 966560, at *6 (E.D. Tenn. Mar. 6, 2024). But under the former regulations governing the evaluation of medical opinions, the Sixth Circuit determined that when an ALJ does not strictly comply with legal procedures for evaluating opinions, such error may be harmless when: (1) the opinion is so patently deficient it could not be credited; (2) the opinion was actually adopted; or (3) the ALJ met the goal of these procedural safeguards, despite not strictly complying

with the regulations. *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 547 (6th Cir. 2004). District courts in this circuit continue to apply that harmless-error standard under the current regulations. *See Musolff v. Comm'r of Soc. Sec.*, No. 1:21-cv-1739, 2022 WL 1571864, at *13 (N.D. Ohio Apr. 27, 2022) (collecting cases). Consistent with Dr. Haaga's opinion, the RFC limits Ms. Troyan to simple, routine tasks. (*Compare* Tr. 404 *with* Tr. 22). Although the ALJ did not articulate how he considered the supportability and consistency of Dr. Haaga's opinion, he adopted the restriction to performing simple, routine tasks so the error is harmless.

Ms. Troyan also asserts the ALJ erred by not incorporating Dr. Haaga's restriction to repetitive tasks. (ECF #11 at PageID 552). But, as explained above, Dr. Haaga did not restrict Ms. Troyan to repetitive tasks. Instead, Dr. Haaga only noted Ms. Troyan is "likely to learn more repetitive tasks" because anxiety "may interfere with remembering and carrying out instructions." (Tr. 404).

Finally, Ms. Troyan claims the limitations in the RFC do not account for the extent of the restrictions in Dr. Haaga's report. First, she argues that limiting her to "occasional workplace changes" that are "explained in advance of gradual implementation" does not adequately reflect Dr. Haaga's finding that Ms. Troyan has "few adaptive skills to allow for responding appropriately to work pressure." (ECF #11 at PageID 552). She also claims that restricting her to jobs that do not require strict production quotas does not accommodate Dr. Haaga's opinion that her symptoms "will likely cause difficulties in maintaining persistence and pace to perform simple tasks or will at least exacerbate those difficulties." (*Id.*).

Neither argument has merit. First, Dr. Haaga did not offer any opinions about Ms. Troyan's ability to respond appropriately to work pressures. She stated Ms. Troyan "[s]eemed

anxious in the interview and seems to have few adaptive coping skills." (Tr. 404). Second, as determined above, Dr. Haaga's opinion that symptoms will "likely cause difficulties" or "exacerbate those difficulties" in her ability to maintain attention and concentration was vague and the ALJ did not err in excluding it from the RFC.

## II.     The ALJ erred in evaluating the state agency psychological consultant's opinion.

Next, Ms. Troyan claims the ALJ "improperly ignored" the state agency consultant's opinion restricting her to tasks involving one-to-three-step instructions and suggests he "played doctor" in doing so. (*Id.* at PageID 556). In support, she cites cases standing for the general proposition that an ALJ may not "play doctor" by making medical judgments, substituting his knowledge for that of a physician or medical expert, or interpreting raw medical information. (*Id.* at PageID 557).

On reconsideration, Dr. Haskins reviewed Ms. Troyan's medical records and determined she "can understand and remember very short and simple instructions. 1-3 steps." (Tr. 69). The ALJ "ignore[d] the limitation" because "[e]xperience has shown a wide divergence regarding the significance, and even the meaning, of tasks divided by the number of steps; between, but also within, the medical and vocational communities." (Tr. 26). He then determined Ms. Troyan can engage in competitive work if limited to performing simple, routine tasks and making of no more than simple work-related decisions. (*Id.*).

The ALJ is not required to adopt medical opinions verbatim or wholesale. *See Reeves*, 618 F.App'x at 275. Nevertheless, when the ALJ's RFC assessment "conflicts with an opinion from a medical source," the ALJ "must explain why the opinion was not adopted." *See Fleischer*, 774 F.Supp.2d at 881. The Commissioner asserts the ALJ explained his reasoning for not adopting

a limitation confining Ms. Troyan to tasks involving three or fewer steps. (ECF #13 at PageID 576).

I disagree with Ms. Troyan that the ALJ "played doctor" in omitting the limitation to one-to-three-step tasks in the RFC. The ALJ did not make a medical judgment, such as by interpreting raw medical data differently than the state agency consultants. *See Herbert v. Comm'r of Soc. Sec.*, No. 1:22-cv-00533, 2023 WL 6155984, at *3 (N.D. Ohio Sept. 21, 2023) (holding the ALJ impermissibly played doctor when the ALJ discredited the state agency consultant's opinion that plaintiff's unremarkable physical examinations and ejection fractions between 50-60% limited her to light work and then determined that same medical evidence justified limiting plaintiff to medium work).

Nonetheless, the ALJ's explanation is not sufficient because the Court cannot meaningfully evaluate whether substantial evidence supports his conclusion about the persuasiveness of Dr. Haskins's opinion. The ALJ purposely relinquished his duty to consider the limitation, not because the evidence showed Ms. Troyan was not limited to that extent, but because his experience suggests a lack of consensus in or between the medical and vocational communities about the significance or meaning of such a restriction. But whether medical and vocational experts might disagree about the extent to which a one-to-three-step-task limitation affects a claimant's ability to perform a particular job is not relevant to the ALJ's assessment of the persuasiveness of a medical opinion. And the explanation—bereft of any discussion of the medical evidence relevant to Ms. Troyan's ability to understand, remember, and complete tasks—does not allow the Court to meaningfully review whether substantial record evidence record supports the ALJ's conclusion to

28

discount that limitation. For this reason, I recommend the District Court **REVERSE** the Commissioner's decision and **REMAND** for additional proceedings.

### III. On remand, Ms. Troyan's noncompliance with her medication regimen requires assessment.

Although Ms. Troyan did not raise other issues, I note further error in the ALJ's analysis that requires attention on remand. The ALJ's review of the medical evidence emphasized that Ms. Troyan's medications help manage her psychiatric symptoms when she takes them regularly, but she is "only partially compliant" with her regimen. (Tr. 23). In addition, he noted significant gaps in her treatment. (Tr. 24). Under the applicable regulations, these are appropriate factors to consider when evaluating the intensity, persistence, and limiting effects of symptoms. SSR 16-3p, 2017 WL 5180304, at *7-8. But the ALJ "will not find an individual's symptoms inconsistent with the evidence in the record on [that] basis without considering the possible reasons [she] may not comply with treatment or seek treatment consistent with the degree of her complaints." *Id.* at *8. This is because an individual's mental impairments may prevent an individual from understanding the need for consistent treatment. *Id.*

In this case, Ms. Troyan reported forgetting to take her medications. (*See, e.g.,* Tr. 429). The longitudinal record, which the ALJ did not acknowledge when summarizing the medical evidence, shows a history of varying compliance with treatment. Additionally, notes from Ms. Troyan's treating provider state her prognosis is complicated by medication-noncompliance issues and borderline personality disorder, a diagnosis the ALJ also did not address.

I thus recommend the District Court further order the ALJ on remand to consider the reasons Ms. Troyan did not comply with her medications or attend treatment consistently in accordance with the applicable regulations.

CONCLUSION AND RECOMMENDATION

Following review of the arguments presented, the record, and the applicable law, I recommend the District Court **REVERSE** the Commissioner's decision denying supplemental security income and **REMAND** the matter for further proceedings.

Dated: August 25, 2025

_____
DARRELL A. CLAY
UNITED STATES MAGISTRATE JUDGE

OBJECTIONS, REVIEW, AND APPEAL

Within 14 days after being served with a copy of this Report and Recommendation, a party may serve and file specific written objections to the proposed findings and recommendations of the Magistrate Judge. *See* Fed. R. Civ. P. 72(b)(2); *see also* 28 U.S.C. § 636(b)(1); Local Civ. R. 72.3(b). Properly asserted objections shall be reviewed de novo by the assigned district judge.

Failure to file objections within the specified time may result in the forfeiture or waiver of the right to raise the issue on appeal, either to the district judge or in a subsequent appeal to the United States Court of Appeals, depending on how or whether the party responds to the Report and Recommendation. *Berkshire v. Dahl*, 928 F.3d 520, 530 (6th Cir. 2019). Objections must be specific and not merely indicate a general objection to the entirety of the Report and Recommendation; "a general objection has the same effect as would a failure to object." *Howard v. Sec'y of Health and Hum. Servs.*, 932 F.2d 505, 509 (6th Cir. 1991). Objections should focus on specific concerns and not merely restate the arguments in briefs submitted to the Magistrate Judge. "A reexamination of the exact same argument that was presented to the Magistrate Judge without specific objections 'wastes judicial resources rather than saving them and runs contrary to the purpose of the Magistrates Act.'" *Overholt v. Green*, No. 1:17-CV-00186, 2018 WL 3018175, at *2 (W.D. Ky. June 15, 2018) (quoting *Howard*, 932 F.2d at 509). The failure to assert specific objections may in rare cases be excused in the interest of justice. *See United States v. Wandahsega*, 924 F.3d 868, 878-79 (6th Cir. 2019).